No. 11911

IN THE SUPREME COURT OF THE STATE OF MONTANA

1971

---

IN THE MATTER OF THE ESTATE OF
MACK G. HALL, Deceased.
JAMES HALL, RUBY CHRISTNER and
CLARA RAMER,

    vs.               Contestants, Plaintiffs, and Appellants,

LURA MILKOVICH, Executrix of the
Estate of Mack G. Hall, Deceased;
and Mac Christner et al.,

               Proponents and Defendants, and Respondents.

---

Appeal from:  District Court of the Ninth Judicial District,
              Honorable R. D. McPhillips, Judge presiding.

Counsel of Record:

    For Appellants:

        Marra and Wenz, Great Falls, Montana.
        Joseph R. Marra argued, and Warren Wenz appeared,
         Great Falls, Montana.
        Robert E. Kovacevich, Spokane, Washington.
        David H. Nelson appeared, Conrad, Montana.

    For Respondents:

        Harwood, Galles, Gunderson & Beiswanger, Billings,
         Montana.
        Dale F. Galles argued, Billings, Montana.
        Hutton, Schiltz and Sheehy, Billings, Montana.
        John C. Sheehy argued, Billings, Montana.
        Aronow, Anderson & Beatty, Shelby, Montana.
        Robert G. Anderson argued, Shelby, Montana.
        Sherman and Anderson, Conrad, Montana.
        William B. Sherman appeared, Conrad, Montana.

---

Submitted:  October 26, 1971

Decided: JAN 2 4 1972

Filed: JAN 2 4 1972

                                  Clerk

Mr. Justice Gene B. Daly delivered the Opinion of the Court.

This is a will contest which came on for trial to the court sitting with a jury in the ninth judicial district, county of Pondera. After the close of the plaintiff-contestants' case in chief, the court granted a directed verdict in favor of defendant-proponents. From that judgment, the plaintiff-contestants appeal.

Mack G. Hall died of cancer at the age of 81 on August 3, 1966. He had farmed in the vicinity of Pondera County since he was a young man. His first wife died about 1928, leaving him with four small children to raise. His son James, born in 1923, remained on the farm and in later years farmed on shares with his father. Ruby, his oldest child born 1919, helped raise the younger children on the farm. She married the hired man, was divorced and remarried. Her children, the Christner children, are proponents of the will in this contest. Clara, born in 1926, left the farm in her teens. Dorothy, now deceased, left two children, Dennis and Delane McKinney, who were adopted and raised by Mack Hall and his second wife, Ada Hall. They are now known as Dennis and Delane Hall (grandchildren and adopted children of the deceased), and are also proponents of the will.

Ada Hall, the surviving widow, knew the deceased in 1909 but married a Mr. Crist and has six children by him. In 1946, the deceased, Mack Hall, visited the Crists in Illinois. Ada Crist came to Montana to visit Mack Hall in the summer of 1947. She divorced her husband in October 1947, and returned to Montana and married Mack Hall in December 1947.

There is a long history of animosity between Ada Hall and the natural children of Mack Hall, beginning with their marriage on December 7, 1947. In the preceding 20 years before this marriage Mack Hall had lived alone and had a manifest love for his children. However, following the marriage in 1947, the family relationship was soured by the fights, disagreements, and discords between Ada and his children. One by one the remaining children moved away and became infrequent visitors.

Nevertheless, as evidenced by Mack Hall's first will of 1952, his intended testamentary disposition was a natural one embracing his natural children and his second wife, Ada.

In 1963, Mack Hall was beset by the beginning of a long series of illnesses including terminal cancer, which was diagnosed as early as 1964. In 1964 he was already a very sick man and his illness resulted in hospitalization thirteen times. This was Mack Hall's condition during the time four wills were drawn in short succession. Three were drawn in November 1965, and the last will on May 17, 1966; all of which disinherit his natural children. The entire thrust of this will contest is centered upon the last nine months of Mack Hall's life, during which time these wills were drawn.

Instrumental during this nine month period is the close association and influence exercised upon Mack Hall by one Mark Milkovich, a mutual funds salesman, who sold Mack Hall $64,000 worth of mutual funds between December 14, 1965 and May 13, 1966. Mark Milkovich admits he sold the mutual funds to Mack Hall in trust for Ada Hall with full knowledge that Mack Hall was dying of terminal cancer.

Concurrent with these sales Mark Milkovich was named executor and co-trustee in the three wills executed in November 1965; Milkovich's wife was named as executrix and co-trustee in the last will dated May 17, 1966.

Mark Milkovich is charged, along with Ada Hall, with undue influence and fraud resulting in rich present and future rewards for both. Ada Hall's financial position grew by about $64,000, with Milkovich receiving substantial commissions. In addition to these sums, in the immediate future Milkovich or his wife would receive the substantial executor's fee under the will of Mack Hall, while also providing themselves with annual fees as co-trustees.

At issue in the present case is the legality and effect of the last will and testament of Mack G. Hall, which disinherits the testator's three surviving natural children under two separate trusts which are provided as a marital deduction trust and a residuary trust. The value of the estate is between $450,000 and $600,000. Under the last will of May 17, 1966, Lura Milkovich is appointed as executrix of the will with Lura Milkovich and the Pondera Bank of Montana, Conrad, Montana named as trustees.

Under the marital deduction trust, one-half of decedent's estate including property which passed to the wife outside the will, would be considered part of the trust for the benefit of the wife with the power of appointment in her. Out of the income from the property held in the marital deduction trust, the trustees are to pay to the wife such income in quarterly installments, so long as she shall live. The corpus of the trust would remain in the trustees until the death of the wife. Upon such event, the trustees deliver the corpus of the estate to such persons as she

by power of appointment might provide in her last will; but if she made no provision in her last will, upon her death the trustees would pay over and distribute the corpus of the marital deduction trust to Mack Hall's adopted children, Dennis Ray Hall and Delane Hall, share and share alike. It is provided that such adopted children shall not sell or encumber the will property during their lifetime.

Under the terms of the residuary trust of the last will, the residue of the estate is placed in trust with the same co-trustees, Lura Milkovich and Pondera Bank of Montana, to hold the same and to pay therefrom all the rents, income and profits in eleven equal shares to the eleven grandchildren of the decedent, including the grandchildren he adopted on November 8, 1965. The residuary trust should continue until January 1, 1974, when it terminates absolutely, and at that time the remaining residuary trust property is to be set over to Dennis Ray Hall and Delane Harry Hall, the adopted children of the decedent, in equal shares. In addition, the residuary trust is subject to two express stipulations of the decedent, first that the farm home near Brady shall be subject to a life use by the widow Ada Hall; secondly, that the trustees of the residuary trust may sell, dispose, or mortgage any or all of the trust property during the life of the trust at their discretion, if it is in the best interest of the trust estate. The trustees for both trusts are Lura Milkovich and the Pondera Bank of Montana.

Testator Mack Hall's last will and testament executed on May 17, 1966, was admitted to probate by the district court on January 9, 1967, appointing Lura Milkovich, wife of Mark Milkovich, executrix, as provided in the will. On June 8, 1967, James Hall and Ruby Christner, two of decedent's three surviving children,

filed a petition for revocation of probate, reciting undue influence had been exercised upon decedent preceding his death, along with the debilitating effects on his testamentary capacity due to sedation, terminal disease, and advanced age.

In a separate petition for revocation on the same date, Clara Ramer, decedent's third surviving child, joined in seeking revocation of admission of the will to probate. On September 7, 1967, Ruby Christner petitioned the district court to appoint an attorney to represent her five natural children, Mac Christner, Lois Christner, Richard Christner, James Christner and Robert Christner, grandchildren of Mack G. Hall and named devisees and legatees under the May 17, 1966 will, which petitioners were preparing to contest.

On October 30, 1967, by way of stipulation among the parties through their respective attorneys, the district court ordered that authorization be given to the attorneys for examination and copying of all or any part of the records of Mack G. Hall in the Montana Deaconess Hospital, Great Falls, Montana, and St. Mary's Hospital of Conrad, Montana, for the period from January 1, 1962 to date of decedent's death.

On April 10, 1970, petitioners James Hall and Ruby Christner filed an amended petition for revocation of probate, followed by a similar amended petition by Clara Ramer on April 20, 1970, joining the issue. In substance the petitions were identical and repeated claims of undue influence and lack of testamentary capacity due to sedation, weakened physical condition, weakened mental condition and elaborated upon the undue influence, fraud and deceid practiced by Ada Hall, widow, assisted by Mark Milkovich, the mutual fund salesman.

The issues raised by the amended petitions filed by contestants came on for trial before the court and jury on April 24, 1970. After the close of plaintiff-contestants' case in chief, on motion of the defendant-proponents, the court directed a verdict for proponents dismissing contestants' petitions, whereupon this appeal was taken.

Appellants' issues on review are:

1. Whether hospital records of the decedent should have been admitted into evidence in an attempt to show that decedent lacked testamentary capacity at the time of executing his last will.

2. Whether plaintifts established a prima facie case of undue influence, fraud, or lack of testamentary capacity.

3. Whether the trial court erroneously granted defendants a directed verdict or if any motion was granted, plaintiffs' motion for a directed verdict should have been granted.

Appellants' position is that Mack Hall's primary driving force was to build an estate and keep it together as a single manageable economic unit, as was demonstrated in the first will drawn in 1952, when he was well and 67 years of age. That testimony at the trial reflected his desire not to have his land sold or mortgaged. That after Mark Milkovich, the mutual fund salesman, became associated in estate planning, together with Ada Hall, during the last months of deceased's terminal illness, there was a steady erosion of the estate into their hands; all natural children were disinherited by a series of four wills drawn in the nine month period from November 1965, to May 1966, together with the sale to the deceased, in trust for Ada Hall, of $64,000 in mutual funds. That Mark Milkovich was actively instrumental

in the making of the last four wills and was named executor and co-trustee in the three wills drawn on November 3, 8, and 22, 1965. That the will drawn November 22, 1965, contained a controversial power of appointment in Ada Hall, the widow. This we will discuss later in this opinion.

That the last will drawn May 17, 1966, and admitted to probate was drawn at Mark Milkovich's request because he wanted to substitute his wife as executrix and co-trustee since he had been informed at a company meeting that his company could be sued if he remained the co-trustee and executor. However, this last will contained a new power, not in the previous wills, granting the co-trustees the power to sell and encumber the land.

Appellants produced evidence that Ada Hall promised decedent she would not exercise the power of appointment contained in the marital deduction trust. They contend Mark Hall executed his will in reliance on this promise. At trial, Ada Hall testified she could not remember making such a promise, but rather that Mack wanted her to have the estate.

The importance of the power of appointment is that if it was not exercised, then the corpus would go into the residuary trust and eventually to two of decedent's natural grandchildren. On the other hand, if Ada Hall exercised the power, then she could effectively divert the trust corpus to anyone she wished. Here, appellants contend that she intended to exercise the power in favor of children of her previous marriage. Further, appellants contend that the promise of Ada Hall not to exercise the power was a material inducement to the executing of the will by decedent.

Appellants contend decedent had been ill since 1963; had been hospitalized numerous times; had difficulty remembering current events but could recollect the past (things that happened years ago); had twice set his bed on fire; and had asked about nonexisting events. Further, that had the hospital records been

admitted into evidence they would show or prove decedent was of weakened mind and body and under continuous sedation or medication at the time of the execution of the last will in the Conrad hospital.

Respondents' argument generally is directed at the execution of the last will. They contend the directed verdict was proper because appellants failed to establish a prima facie case of fraud, undue influence, or lack of testamentary capacity. Further that appellants had the burden of establishing the above by substantial evidence, which they failed to do for these reasons:

A. There is no evidence, in the record or otherwise, that the decedent Mack G. Hall was incompetent to make a will on May 17, 1966, the date of his last will.

B. There is no evidence, in the record or otherwise, that at the time decedent Mack G. Hall made his last will, on May 17, 1966, that he was acting under the undue influence of any person whomsoever.

C. There is no evidence, in the record or otherwise, that the last will of the decedent Mack G. Hall, dated May 17, 1966, was a result of any fraud upon him by any person whomsoever.

D. The trial court was correct in directing a verdict sustaining the last will of the decedent Mack G. Hall, dated May 17, 1966.

Concerning the trusts, respondents contend that this was the device selected by deceased because Dennis and Delane were minors and he did not want the land sold or mortgaged, and he wanted them to have a college education and the land. The multiple wills were explained as a device to make more wills for his children to contest, knowing a contest would ensue. The attorney who drew the wills testified Ada Hall promised not to

exercise the power of appointment and the estate would go to Dennis and Delane, just as decedent wanted. He further testified

Ada Hall had him draw a will /that did not exercise the power.
for her

Thus, the respondents argue that the promise, if an inducement, is fully performed and not fraud. They further argue there is an additional burden that must be met by appellants inasmuch as the will once admitted is presumed valid.

Here, we point out this Court has before it for its determination only one issue and that is to determine from the record if the cause was properly withdrawn from the jury. In so doing we must recognize that the law does not favor directed verdicts and the evidence therefore will be viewed in the light most favorable to appellants, as having proved what it tends to prove.

Section 93-5205, R.C.M. 1947, provides:

"Directed Verdict--when. Where, upon the trial of an issue by a jury, the case presents only questions of law, the judge may direct the jury to render a verdict in favor of the party entitled thereto."

Rule 50, Montana Rules of Civil Procedure, provides:

"Motion for a directed verdict and for judgment notwithstanding the verdict.

"(a) MOTION FOR DIRECTED VERDICT--WHEN MADE, EFFECT. A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury."

The long recognized case of Johnson v. Chicago, M.& St. P.R.Co., 71 Mont. 390, 394, 230 P. 52, stated the framework for

interpretation:

> "In the interpretation of that statute, this court has announced the following rules:
>
> "(1) Upon a motion for a directed verdict in favor of the defendant, the evidence introduced by the plaintiff will be considered in the light most favorable to him and as proving whatever it tends to prove.
>
> "(2) A cause should never be withdrawn from the jury, unless the conclusion from the facts follows necessarily, as a matter of law, that a recovery cannot be had upon any view which can be drawn reasonably from the facts which the evidence tends to establish.
>
> "(3) In reviewing an order directing a verdict for the defendant, this court will consider only the evidence introduced by the plaintiff, and if that evidence, when viewed in the most favorable light, tends to establish the case made by the plaintiff's pleadings, the order will be reversed. (Citing cases)
>
> "The term 'plaintiff's evidence,' as employed in the foregoing rules, excludes merely a bare scintilla, but includes every fair inference which may be drawn from the facts proved and, as well, any evidence introduced by the defendant which tends to support the plaintiff's case."

The law has become too well settled since _Johnson_ in 1924, to require the restating of the numerous citations affirming the doctrine. This was recognized by the Court in the most recent decision Shields v. Murray, _____Mont._____, 481 P.2d 680, 682, 28 St. Rep. 211, where the Court in reversing the trial court's order withdrawing a case from the jury, again affirming this doctrine, stated:

> "This Court, on a number of occasions, has stated that cases and issues should not be withdrawn from a jury unless reasonable and fair-minded men could reach only one conclusion from the facts. (Citing cases). Genuine questions of fact should be submitted to the jury. (Citing case). A corollary to the above rule is that substantial evidence justifying submission of an issue to a jury exists when reasonable men might reach different conclusions from the facts. Parini v. Lanch, 148 Mont. 188, 418 P.2d 861." (Emphasis supplied).

- 10 -

While this case presents a contest involving the last will and testament of Mack Hall, this will cannot stand alone in view of the allegations of undue influence, fraud, and lack of testamentary capacity. From the testimony and exhibits introduced into evidence at the trial, we find there were four wills, three drawn within a one month period and all four within a six month period, all of which contained marked variations in testamentary disposition and effect upon his landed estate. These successive wills in a short period of time prior to the death of the 81 year old testator with a long history of declining mental and physical health due to a painful terminal cancer, bear close examination.

Section 13-311, R.C.M. 1947, defines undue influence:

"Undue influence consists:

"1.   In the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him;

"2.   In taking an unfair advantage of another's weakness of mind; or,

"3.   In taking a grossly oppressive and unfair advantage of another's necessities or distress."

Respondents rely heavily on language this Court used in Estate of Cocanougher, 141 Mont. 16, 25, 375 P.2d 1009, when the Court quoted from In re Hegarty's Estate, 46 Nev. 321, 212 P. 1040:

"'Courts have neither the right nor power to reframe the wills of decedents, nor to overthrow the expressed intent therein contained, in the absence of direct and substantial proof sufficient to bring the case within the well-established rules of law regarding undue influence.'"

This Court is mindful of the dignity that it has reposed in a decedent's will and reaffirms this doctrine. But we must

recognize that the Court had Cocanougher before it on appeal twice after jury verdicts finding undue influence and properly found that the evidence revealed none.  Therefore that doctrine has no application to the issue before us in the instant case.

We will not address ourselves to the ultimate issue concerning the validity of testator's will, but will only consider the case law to define the areas of relevancy that may be considered to determine if there remain issues raised upon which reasonable men could disagree.

This Court in Estate of Maricich, 145 Mont. 146, 161, 400 P.2d 873, said:

"The law in the cases concerning undue influence places upon the contestant the burden of proof in showing substantial evidence of undue influence. In determining this issue on undue influence we may consider:

"(1)  Confidential relationship of the person attempting to influence the testator;

"(2)  The physical condition of the testator as it affects his ability to withstand the influence;

"(3)  The mental condition of the testator as it affects his ability to withstand influence;

"(4)  The unnaturalness of the disposition as it relates to showing an unbalanced mind or a mind easily susceptible to undue influence; and

"(5)  The demands and importunities as they may affect particular testator taking into consideration the time, the place, and all the surrounding circumstances."

Here, in view of the evidence, the successive wills in testator's declining days, and the dismemberment of testator's estate under those wills, this Court is compelled to seek a factual determination to a series of inconsistencies.

It is myopic to fail to correlate the declining physical state of the 81 year old decedent in his last six months of life with the sudden rash of wills, diverse in their patterns as com-

pared to testator's will of 1952, and erosive in their effect upon testator's estate. These concurrent patterns of events raise grave questions of fact upon which a lawful determination has no place, absent a jury determination. Further, at trial testimony was given that testator's mind reflected to past events in his life while his grasp of present events slipped and wandered. As the record of medical treatment was excluded at trial and the case was not presented to a jury, the critical factual determination of testator's comprehension, awareness, and concentration was not factually determined. Reflecting upon the records of medication, indeed, on the last day preparatory to signing the last will testator was receiving regular injections of codeine, the effect of which could be material.

The totality of the testimony and evidence at trial goes beyond the mere suspicion of undue influence, fraud, and incapacity and substantially bears upon the issues pleaded in the petitions for revocation of will. There was not only a mere opportunity to influence, but active procurement of counsel in its preparation. The provisions alone, in view of testator's intent, are in question as to his concepts and relationships during this period.

Standing alone, the testimony of witnesses is enough to the present sufficient evidence as to factual issues which necessarily should be placed before a jury, as to both testator's mental and physical condition.

Reference to the materiality of the changes in wills during testator's last days equally raises questions of fact which are directly in issue in view of the allegations of contestants of fraud and undue influence practiced upon testator during the period.

What remains ultimately as a question of fact is what has been described in Murphy v. Nett, 47 Mont. 38, 52, 132 P. 451, as:

"In a case involving undue influence the question is not what effect the supposed influence would have had upon an ordinarily strong and intelligent person, but its effect upon the person on whom it was exerted, taking into consideration the time, the place and all the surrounding circumstances."

Additionally, it should be noted that a significant body of contestants' offered evidence was ruled inadmissible at the trial and it is to this excluded testimony that we now direct our attention. As is clear from point (2) of the test stated in Maricich, the physical condition of the testator as it affected his ability to withstand influence is an issue for factual determination. However, as appellants point out in argument, all hospital records of Mack Hall were ruled inadmissible at the trial.

The transcript reveals the parties stipulated at the pretrial conference that foundation would not be required to admit the hospital records into evidence under the Uniform Business Records as Evidence Act, Chapter 801, Title 93, R.C.M. 1947.

However, at trial an objection was made by defendants to the admission of these records on the ground that it had not been shown that these records were relevant. After argument their admission was denied. It must be clear from our discussion that this Court considers the undeniable factual content of these records, as they bear on testator's physical and mental condition, relevant to the ultimate issues of this case. It does injustice to the rational process of weighing the facts to deny admission of those facts upon which reasoned judgment must be based.

There is no pretrial order in the district court file. A pretrial order would or should reflect precisely what agreements were made between the parties and the court in reference to these exhibits. If these exhibits were not relevant in total, or if interpretation of these records requires expert testimony for qualified analysis, or if some objections were preserved beyond foundation, the pretrial process should have resolved the problem.. The record at trial indicates it could have been a misunderstanding but lacking the factual support of a pretrial order, we will limit our observations to what has been said for guidance when the matter is processed for retrial.

Accordingly, the judgment granting a directed verdict is reversed and a new trial ordered.

_____
Associate Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Associate Justices.