No. 12417

IN THE SUPREME COURT OF THE STATE OF MONTANA

1973

---

IN THE MATTER OF THE ESTATE
OF BUDOIN E. POWERS, Deceased.

---

Appeal from: District Court of the Thirteenth Judicial District,
Honorable Robert Wilson, Judge presiding.

Counsel of Record:

For Appellant:

Berger, Anderson, Sinclair and Murphy, Billings,
Montana
James J. Sinclair argued, Billings, Montana
Crowley, Kilbourne, Haughey, Hanson and Gallagher,
Billings, Montana
Cale Crowley argued, Billings, Montana

For Respondent:

Robert C. Brogan, Billings, Montana
Keefer and Roybal, Billings, Montana
Neil Keefer argued, Billings, Montana

---

Submitted: September 12, 1973

Decided: OCT 3 0 1973

Filed: OCT 3 0 1973

*Thomas J. Kearney*
Clerk

Mr. Justice Wesley Castles delivered the Opinion of the Court.

This is an appeal from a judgment denying the probate of the will of Budoin E. Powers, dated December 9, 1971. An earlier will dated December 18, 1969, was admitted to probate. A motion for new trial was denied. The will contest was tried before a jury which returned a special verdict finding that Budoin Powers was not competent to execute a will on December 9, 1971; that undue influence had been exerted on her; that the will was procured by fraud; that the deceased did not acknowledge to the witnesses to the will that it was her last will and testament; and, that it was not properly executed. More will be said later in this Opinion concerning the special verdict.

Four issues are raised on appeal:

(1) Failure of the trial court to grant proponents' motion for a directed verdict, made both at the close of contestants' case and at the close of all of the evidence on the grounds that there was no competent substantial evidence supporting a holding of invalidity of the will.

(2) The submission of a special verdict when there was no competent substantial evidence to warrant consideration by a jury.

(3) The special verdict was in direct conflict with a given instruction.

(4) The giving and refusing of certain jury instructions.

As background for our discussion, the following facts are set forth:

Budoin Powers was married twice during her lifetime, giving birth to two separate and distinct families. She was divorced from Clarence Shelden around 1940, and had six small children to support. She subsequently married T. R. Powers, a man 23 years her senior and an established rancher. The Shelden children apparently lived on the Powers ranch only until they were old enough

to go on their own. They then went their separate ways and there was little communication between them and their mother for many years.

Budoin E. Powers had five children by her marriage to Thomas R. Powers: Patrick Powers, Penny Powers (Mrs. Anthony Bear Don't Walk), Paul Powers, Danny Powers and Darwin Powers. These children were raised on the Powers ranch near Wyola. After the death of T. R. Powers the family continued to operate the ranch until it was ultimately leased in 1967 to Little Horn Land and Livestock Company of Wyola.

T. R. Powers, the father of contestants, died in 1964. His last will and testament dated May 22, 1958, left another ranch situate in Glacier County in trust for his five children born of his marriage to Budoin Powers. The remainder of his estate was left to Budoin Powers, with a proviso that if she predeceased him the remainder would be held in trust for the five Powers children to be distributed when the youngest reached the age of majority.

Budoin Powers likewise executed a will in 1958. Her entire estate at that time was left to the five Powers children in trust to be distributed when the youngest attained the age of majority.

After the death of T. R. Powers, Budoin Powers executed a second will on January 19, 1967. This will left $5,000, payable out of life insurance proceeds only, to each of the six Shelden children. The remainder of her estate was placed in trust for the five Powers children to be distributed to them when the youngest attained the age of majority.

On December 18, 1969, Budoin Powers executed a third will. In this will she, for the first time, enumerated the six Shelden children. The 1969 will left certain royalty and mineral interests to Montana State College at Bozeman and to the Shelden children. She again left to the Shelden children the sum of $5,000 each, payable out of life insurance proceeds only. The remainder of her

estate was left to the Powers children, excluding Patrick, in trust, for distribution when the youngest attained the age of majority.

On December 9, 1971, Budoin Powers executed yet another will. In this will, with the sole exception of a $10,000 trust for Penny Bear, the Powers children were disinherited.

Budoin Powers died in Billings, Montana, on June 20, 1972, at the age of 60. On June 27, 1972, one week after her death, petition for probate of the will dated December 9, 1971, was filed in Yellowstone County. On July 7, 1972, the five children of Budoin Powers and T. R. Powers filed a petition in opposition to probate of that will.

The 1958 will of T. R. Powers named Budoin Powers as Trustee of the Glacier County ranch. The trust named the Powers children as beneficiaries and was to terminate in September 1973, when the youngest child reached the age of majority. As it happened the age of majority was lowered by legislative action and the trust was terminated sooner. The will being contested here was executed on December 9, 1971. The testatrix, Budoin Powers, executed documents effectively distributing the Glacier County ranch trust assets to the Powers children on December 8, 1971.

As to the will of December 9, 1971, the events leading to its execution appear from the record:

J. H. Kilbourne, Esquire, had drafted prior wills for both T. R. Powers and Budoin E. Powers, including the will of December 18, 1969 of Budoin Powers. The will here contested was drafted in final form on November 18, 1971, although not executed by Budoin E. Powers until December 9, 1971. The two witnesses were Robert Lee and Kemp Wilson, attorneys associated with J. H. Kilbourne, and with the law firm of Crowley, Kilbourne, Haughey, Hanson & Gallagher.

Kilbourne first referred Budoin E. Powers to Robert Lee on legal matters in the spring of 1971. At that time Lee represented her in a guardianship proceeding; in a municipal court case; and had considerable contact with her concerning the handling of the

Glacier County ranch trust created in the will of T. R. Powers for the benefit of the Powers children, contestants here.

On October 17, 1971, Budoin Powers was taken to the intensive care unit at the hospital as a result of a heart attack. On October 20, 1971, Kilbourne requested Lee to go see her concerning a new will. Lee went to the hospital on that date, advised the hospital personnel that he had legal matters to discuss with Budoin Powers and was permitted entry into the intensive care unit for that purpose.

Here, we digress somewhat to bring in other factors.

Proponent Thelma Shelden Daly, 37 years of age, left the Powers ranch when she was 13 or 14 years of age and went to live with a sister in Idaho. When she was almost 16 she became gainfully employed in Seattle, Washington for about four years, until she married. She returned every year thereafter to visit her mother. She stayed at the Rimrock Lodge and at her half sister's home (Penny Powers Bear), during her mother's illness. Shortly after her mother's first heart attack, at her mother's request, she removed all of her mother's belongings from Penny's home. When her mother left the hospital on November 4, 1971, her mother took the things back to Penny's home where she went to live because the doctor specified that she should be accompanied by someone.

The day before Bedoin Powers' second heart attack, November 18, 1971, she went to a motel to stay with Thelma Shelden Daly and it was from that motel that she called Mr. Lee. At that time Thelma was planning to take her mother back to Portland to stay with her. After her mother had her second heart attack on November 19, Thelma stayed in Billings until November 31, at which time she returned to her home in Portland and did not return to Billings until December 23.

On October 20, 1971, when Lee went to the hospital to talk with Budoin Powers, Thelma Shelden Daly was in the hospital corridor when he arrived, but Lee alone went into the intensive care unit

to talk to Budoin Powers. Exhibit 1 is the handwritten note Lee made during his conversation with Budoin Powers; Exhibit 2 is the note Lee dictated on the same day in his office addressed to Kilbourne covering his conversation with Budoin Powers.

Budoin Powers could not remember birthdates of all eleven of her children, nor the married name of one of the Shelden children who had been divorced and remarried more than once. She was not, however, confused; and Lee had no difficulty nor problem conversing with her.

She told Lee to get the birthdates from the 1969 will, or from Thelma Daly who would assist him. Lee was not certain whether or not he got the birthdates from Thelma, from Budoin Powers, or from the old will. He did know definitely that he had not told Thelma Daly about the will or its contents; that Thelma Daly did not help him in preparing the will in any way; that she might or might not have entered the hospital room while he was there, because Budoin Powers occasionally called either Thelma or nurses in for various matters during the times that Lee was there; but he knew definitely that Thelma was never in the room when he discussed with Budoin Powers the substantive dispositive provisions of the will.

Lee had factual investigations to make to carry out the wishes expressed by Budoin Powers but had an initial final draft ready about October 28, when they expected the will to be executed on October 30. When Budoin Powers began to mend, it was decided not to go ahead with the will at that time. Thinking of the possibility of executing the will about October 30, Lee on October 27, 1971, telephoned the attending physician, Dr. Byorth, and inquired whether there was any medical reason why Budoin Powers could not execute her will, and was advised that there was no such reason. The fee bill reflects the telephone conversation with Dr. Byorth on October 27, and Dr. Byorth confirmed that he had received such a call.

In addition to testifying that he had received the telephone call from Attorney Lee in October, Dr. Byorth referred to notes he

had made upon the admission of Budoin Powers to the hospital in October and his note of October 30 to the effect that she was "oriented as to person, place and time". He recalled his note of October 30 was made because that was the date anticipated for the execution of the will.

Lee's testimony was that when he learned Budoin Powers was on the mend and there was no urgency, it was decided not to go ahead with the will at that time. Furthermore, after taking care of some of the administrative matters to see whether or not her plans were feasible, he testified he "got back with her, oh, on two or three times while she was still in the hospital". Lee had numerous telephone conversations with Budoin Powers after she left the hospital November 4, 1971, and he completed the final draft of the will which she intended to execute in the office on November 18 or 19, 1971.

Two of the contestants, Paul Powers and Penny Bear, who will obtain substantial amounts of money by the revocation of the will, testified concerning Budoin Powers' condition while in the hospital after her first heart attack. Paul Powers testified that she was in pretty bad shape and incapable of intelligent speech when she went in; that she became more coherent after she got out of the intensive care unit, which he thought was a week and a half after she went in. Penny testified that for two days after she went in the hospital October 17, her mother hardly knew who she was, and the condition continued for three or four days. Accepting this testimony at its face value, it stands uncontradicted and undisputed in the record that it was from October 28 on until November 18 that Attorney Lee, as a result of numerous conferences with her, and numerous changes and corrections in the will requested by her, finally completed the document on November 18. Lee testified:

> "* * * So eventually by sort of a process of discussion and finding out what was feasible Mrs. Powers and I arrived at this document which she was satisfied reflected her last will, and she told me she'd be in about the 18th or 19th, the latter part of that week, and we'd have the ceremony * * *."

There is no testimony from any witness to suggest or indicate that any of the Shelden children, including Thelma, knew that the new will was contemplated, or what the terms or provisions were, or ever discussed them with their mother, or exerted any influence of any kind or character whatsoever on their mother concerning the terms and provisions of the will, or ever exerted influence on anyone else.

Repeating, the undisputed facts are: That Budoin Powers entered the hospital on October 17, 1971 and was immediately taken to the intensive care unit. That Lee first talked with her on October 20, 1971, making extensive handwritten and typewritten notes, and on three or four/other occasions before her release from the hospital on November 4. The first draft of the will was completed on October 28, at which time it was anticipated that she would execute the will on October 30, but when she improved physically there was no need for an immediate execution of the will and it was postponed. She left the intensive care unit on November 1, and was released and discharged from the hospital on November 4. Contestant Paul Powers testified unequivocally that she became coherent when she got out of the intensive care unit on November 1. Contestant Penny Bear testified that three or four days after her admission on October 17, she started to recognize people, and could then talk. There is absolutely no evidence of any kind of any lack of competence from that date on until her second heart attack.

The testimony of Lee is uncontradicted and undisputed that the final draft of the will was completed on November 18 as the result of numerous conferences with Budoin Powers between October 20 and November 18, and she was expected at Lee's office to execute the will on November 18 or 19; there was no change before the execution on December 9. Indeed, it is clear there was never any evidence of undue influence or fraud at any time.

Lee's notes handwritten on October 20 quote her reasons for not including the Powers boys, i.e., that property was coming to

them under the Glacier County ranch trust and they must prove they are men. Patrick Powers had already been eliminated from the 1969 will. Mrs. Powers told Lee she was very fond of both Thelma (who did not participate as a beneficiary in the Glacier County ranch involved in the trust created in the will of T.R. Powers), and of Penny Bear (who did participate as a beneficiary in the Glacier County ranch trust). Thelma came to visit her from time to time, and she visited Thelma from time to time. Whenever she needed Thelma, she came. She also felt the same way about Penny, who helped take care of her. She wanted to give Thelma the lion's share, and gave her more than she gave Penny, because Penny and the other four children of T. R. Powers were soon to come into that trust property which was scheduled to terminate in September 1973.

Budoin Powers thought that the Glacier County ranch would produce from $500,000 to $900,000. She did not anticipate that Penny Bear would leave Billings to take part in the operation of the Glacier County ranch, but she wanted to do something special for Penny, so she set up the trust for Penny of $10,000 to take care of odds and ends such as medical expenses and the like. In the event of Penny's demise, the grandchildren were recognized, but Mrs. Powers did not want the money to fall into the hands of Penny's husband, Anthony Bear Don't Walk. She was not certain that the marriage of Penny and Anthony would last, and if that marriage terminated, then she wanted the money to immediately vest in and be available to Penny.

It is also of interest that Budoin Powers had gone to live with Thelma in January 1971 and apparently loaned Thelma $1,000 in July of that year, but there is simply no evidence of any other gratuities to any of the first six of her children born of her marriage to Shelden. On the other hand, she had already made a home for Paul Powers and his wife in Hawaii while he was attending the University of Hawaii and had advanced to Paul some $21,977.73 of trust funds.

Lee completed the final draft of the will on November 18, 1971, solely as the result of numerous conferences between Bedoin Powers and Lee while she was admittedly competent, to insure that the final product carried out her wishes and desires. There is no evidence that any other person ever discussed the contents of the will or the testamentary desires or intentions of Bedoin Powers with either her or with Lee. The will as finally drafted on November 18 was duly executed by Bedoin Powers before Lee and Kemp Wilson on December 9. There is not one shred of evidence of incompetence, undue influence, or fraud in the finalizing of that will on November 18, and Bedoin Powers had sensible reasons for the division of all property between all eleven children in view of the provisions of the Glacier County ranch trust for the five Powers children, and the 1971 will concerning the Big Horn County ranch for the six Shelden children.

From the time of the second heart attack on November 19 through the execution of the will on December 9, these basic facts are not in dispute: November 18, Bedoin Powers left the trailer home where she stayed with her daughter Penny, and went to a motel with her daughter Thelma and Thelma's children. She intended to go to Thelma's home in Portland. She telephoned Lee from the motel. November 19 Penny came to the motel and Bedoin Powers sustained her second heart attack in the presence of Penny, Thelma and Thelma's children. She was immediately taken to the intensive care unit where she had a tracheotomy and the tube was left in her throat.

Thelma left Billings with her children and returned to her home in Portland on November 31, and did not return to Billings until December 23, which is the date her mother was released from the hospital. December 8, 1971, was the date all closing papers including the petition, checks for distribution, and other papers were executed by Bedoin Powers for termination of the Glacier County ranch trust by which the five Powers children acquired all of the trust property. Penny and Paul both executed the waivers of

accounting, and Paul Powers accompanied Lee to the hospital and was present when she executed all of the papers and documents necessary for terminating the trust. On December 9, Kemp Wilson accompanied Lee to the hospital at which time the will, which had been drafted in final form on November 18, was then executed. Bedoin Powers left the intensive care unit December 14 and was discharged from the hospital on December 23, 1971. She died in June 1972.

The impartial testimony of Dr. Byorth, attending physician, and five nurses who took care of her throughout her stay in the intensive care unit is overwhelming evidence. Laurie Vogele was on duty from 3:00 p.m. to 11:30 p.m. December 8; Josephine Keeland from 11:00 p.m. on December 8 until 3:30 p.m. on December 9. In addition, the testimony of nurses Pat Silva and Dora Padilla during the same general period of time confirmed the competency of Budoin Powers.

With respect to tests concerning her ability to understand, the nurses would question her during the first few days she was there, chart the answers, and thereafter when she was aware of what was going on, there was no need to do so. As of December 9, there was no need to ask her the questions any longer, because on that date Bedoin Powers was aware of what was going on.

Nurse Connie Dunn worked five days a week throughout all the time Bedoin Powers was in the intensive care unit and she testified that Mrs. Powers was competent to dispose of her property on December 9, 1971. This judgment was confirmed by nurses Keeland and Padilla.

We have given all of the foregoing details to establish that there were no issues as to undue influence, fraud, lack of execution or witnessing of the will, and the special verdict should not have been submitted to the jury. This alone would require reversal and a new trial. However, there remains the first issue as to whether the motion for a directed verdict should have been granted.

Contestants' position here is that if there was substantial, competent and credible evidence even though the evidence was conflicting, the verdict of the jury should be upheld. Previously we have shown that the verdict cannot be upheld, but our problem is whether there was substantial, competent and credible evidence to withstand the motion for directed verdict.

Contestants cite Reynolds v. Trbovich, Inc., 123 Mont. 224, 210 P.2d 634 and Wyant v. Dunn, 140 Mont. 181, 368 P.2d 917, for the general principle that the jury is the trier of fact and unless the evidence on behalf of the [contestants] is not inherently so improbable as to brand it palpably false, the evidence should be submitted to the jury as the jury is the sole judge of credibility of the witnesses.

In analyzing the testimony submitted, the only possible issue that could have been submitted to the jury was as to the competency of the testatrix. Considering the evidence in the best light possible for the contestants, the most that can be said is that the testatrix had intermittent periods of incompetence, but at the time of execution of the will she was wholly competent.

The only evidence to the contrary, if it be substantial credible evidence, consisted of the testimony of son Paul Powers, daughter Penny Powers (Mrs. Anthony Bear Don't Walk), Allie Williams, an aunt of deceased, and Genevieve Haworth, a friend of many years.

Mrs. Haworth testified that when she talked to Bedoin Powers after her release from the hospital she said she could not remember what went on during her hospital stay. Obviously such a statement does not establish a lack of competency at a given time.

The aunt's testimony regarding a hospital visit where she said Bedoin Powers did not recognize her on the day of the execution of the will does not amount to substantial evidence of incompetency.

The son's and daughter's testimony remains. They are the most interested witnesses. Both would gain by rejection of the will.

Son Paul accompanied Attorney Lee to the hospital on December 8 where Bedoin Powers, as trustee of the Glacier County ranch trust, executed the necessary papers to terminate the trust. Paul received the benefits of the termination; and yet testified that his mother was not only incompetent to execute a last will the following day, but that she was incompetent to execute the trust papers for him on December 8. Such testimony as indicated in the transcript is not credible as a matter of law. Here, after receiving the benefits of his mother's acts, he would be collaterally estopped from disputing her competency to do those acts. Section 49-113, R.C.M. 1947.

Daughter Penny's testimony is of like import. She testified that she visited her mother briefly on the morning of December 9 at which time her mother gave no indication that she knew what was going on. That Bedoin Powers had lucid intervals, at the very least, at all times after the first week following her entry into the hospital on November 19, and that she was competent, aware, and understood everything that was taking place at the time of the execution of her will between 2:00 and 3:00 p.m. on the afternoon of December 9 is all testified to postively by disinterested witnesses.

In determining that the testimony of the son and daughter was not substantial credible testimony sufficient to go to the jury or sufficient to withstand the motion for directed verdict on the issue of competency, we are aware of the rules recently discussed in both the majority and dissenting opinions in Hanlon v. Anderson, _____Mont._____, 502 P.2d 51, 29 St.Rep. 825, and cases cited therein. Generally stated the rule is that this Court will sustain a determination of fact by a trial court based upon substantial conflicting evidence. Our holding here and our analysis of the evidence by way of testimony and documentary evidence reveals that the testimony of Paul Powers, upon which the trial court's decision rested is, while conflicting, not substantial.

He, who received benefits of his mother's execution of documents terminating the Glacier County ranch trust in his favor, will not then be heard to testify that she was incompetent.

Contestants cite In re Estate of Hall v. Milkovich, 158 Mont. 438, 448, 492 P.2d 1388, for the proposition that the issue could and should not have been withdrawn from the jury. We believe a close reading of In re Estate of Hall will reveal the contrary. First, we have heretofore shown that there was no evidence of undue influence. The only issue was competency. In In re Estate of Hall the transcript was replete with evidence that should have been resolved by a jury. Here, lacking Paul's unbelievable testimony not amounting to "substantial" evidence, reasonable men could not reach different conclusions from the facts.

In In re Estate of Hall, a will contest where the trial court granted a motion for directed verdict for proponents dismissing contestants' petitions, an 81 year old testator with a long history of declining mental and physical health due to a painful terminal cancer, had made four wills within six months under circumstances clearly showing fact disputes. This Court stated:

> "Respondents rely heavily on language this Court used in In re Estate of Cocanougher, 141 Mont. 16, 25, 375 P.2d 1009, when the Court quoted from In re Hegarty's Estate, 46 Nev. 321, 212 P. 1040:
>
> " ' "Courts have neither the right nor power to reframe the wills of decedents, nor to overthrow the expressed intent therein contained, in the absence of direct and substantial proof sufficient to bring the case within the well-established rules of law regarding undue influence."'
>
> "This Court is mindful of the dignity that it has reposed in a decedent's will and reaffirms this doctrine. But we must recognize that the Court had Cocanougher before it on appeal twice after jury verdicts finding undue influence and properly found that the evidence revealed none. Therefore that doctrine has no application to the issue before us in the instant case."

In In re Estate of Hall, the trial court had ruled out all evidence of hospital records. In the instant case, all evidence

of hospital records plus the doctor and nurses came in, all attesting to competency. The testatrix here was sixty years of age, active, and admittedly in good mental condition except as the heart attacks might have affected it. Moreover, between heart attacks and hospitalizations and thereafter, testatrix here was competent in all ways.

A number of other matters appear from the record here that we do not dwell upon. The contestants' assertions of unnaturalness of the will, the "Powers" money not going to the "Powers" children, and other matters during the course of the trial were allowed to divert the trial court from the single issue, that of competency, to such a degree that evidence was permitted which was not substantial and credible and often not relevant.

Having examined the record, we find the judgment must be and is reversed and the cause remanded with directions to grant judgment to the proponents of the will of December 9, 1971, and that that will be admitted to probate.

_Wesley Castles_
Justice

We Concur:

_James T. Harrison_
Chief Justice

_Frank I. Haswell_

_Gene B. Daly_

_John Conway Harrison_
Justices.